WILLIAM BITTLES, respondent,

*v.*

WEST RIDGELAWN CEMETERY COMPANY et al., appellants.

[Decided March 5th, 1923.]

On appeal from a decree of the court of chancery advised by Vice-Chancellor Backes, who filed the following opinion:

I shall not preface my remarks with a recital of the history of the case so familiar to counsel. The point reached in the litigation is the certification to the trust company of the holders of temporary certificates entitled to permanent certificates. The trust deeds reserve that to Mr. Gruber, the dummy of Mr. Frank; that is, to Frank; but, as Frank is one of the litigants, the court will make the decision.

There is no dispute as to the ownership of the thirteen thousand five hundred shares, save as to the following, which I will take up in the order of Frank's petition:

(*a*) Certificate No. 167, for two thousand shares, issued to "Ridgelawn Cemeteries" (now No. 408 for one thousand six hundred shares hypothecated with the trust company). Frank claims to have donated the shares to the two cemetery associations, one thousand to each, the proceeds to be used to improve the lands for burial purposes, upon condition that the improvements be made and completed within a year following the transfer. He wants the one thousand shares given to West Ridgelawn returned to him, because, he says, the condition was not performed. The shares were not donated by Frank. They came from the promoters of the enterprise, Frank, Pond and Tate, and the transaction was contractual. The ostensible purchase price of the lands of the two cemetery associations was the thirteen thousand five hundred shares. In consideration of the shares, Frank, on behalf of

himself and his associates, Pond and Tate, agreed to convey the lands, and appropriate two thousand of the shares, to use the language of the proposal, "that two thousand of your shares shall be devoted solely to improvement." Frank and others were to receive net eleven thousand five hundred of the shares. The proof of this we find in *Exhibit 13,* the proposal of Frank to the two cemetery associations, which reads:

"NEW YORK, December 28th, '05.
*East & West Ridgelawn Cemetery:*

DEAR SIRS—We hereby offer to your Cemeteries two hundred and seventy acres of land lying in Acquackanonck Township and of service to your enterprises as per the limitations of your permits, with the understanding that the said lands are and shall be held in perpetuity by the holders of 13,500 shares equal divided and indivisible shares, all of which shall belong to our Associates and ourselves in return for our agreement with the respective former owners thereof, to pay for the same, and in full payment thereof, together with the improvement of our Cemeteries; it being understood that 2,000 of your shares shall be devoted solely to developments.
Yours very truly,"

Frank denies the authenticity of the document, but his denial, like much of his testimony, is vagrant, rash and undependable. The instrument was written on his law firm's stationery, and its genuineness is beyond question; and it is confirmed by the fact that later on and in compliance Frank himself issued temporary certificate No. 167 to "Ridgelawn Cemeteries" for the two thousand shares. Frank never had ownership of them and he is not entitled to be certified the permanent shares.

East Ridgelawn claims the two thousand shares on this ground. In the formation and early promotion of the cemeteries they were a single enterprise, divided into two corporations, only, because of statutory limitations upon landholdings of cemetery associations—one hundred and twenty-five acres. *Comp. Stat. p. 373.* Two thousand shares were to be used for plotting, laying out roads and by-ways, ornamentation, &c., so as to make the cemeteries attractive and marketable. East Ridgelawn, being the more favorably situated, was decided upon to be first exploited. All attention

was given to East Ridgelawn and it has flourished. West Ridgelawn was put in the background, where, geographically, it was anyhow. It was simply a supply—an overflow—to come into use when East Ridgelawn should be exhausted. Frank was then in the saddle, and the plans were his. Now, while the proposition of the promoters, Frank and others, for the two thousand shares was to the two cemeteries, and, ordinarily, the two would be regarded as owners in common, the truth is the shares were appointed to a specific use, and in the circumstances to the use of East Ridgelawn, for, it discharged the use, and, as Frank states in his petition, "no such development was undertaken by said West Ridgelawn, after the shares were deposited for it, of its lands. None was in fact contemplated within the time required by the deposit of shares." That the certificate for the two thousand shares was made out in the name of "Ridgelawn Cemeteries" is of no moment. The ownership followed the use. To approach the point more closely, suppose the shares had been sold and the cash used in the improvement of East Ridgelawn, would it even be now suggested that East Ridgelawn account to West Ridgelawn for one-half the proceeds? East Ridgelawn pledged its credit to meet the expenditures, and is entitled to recourse to the shares, to meet its debts thus incurred. The shares will be certified to East Ridgelawn.

It is a matter of utmost indifference to the shareholders to which of the associations the shares are awarded. Their hope lies in the dividends, to be declared by the trust company, to which the two cemeteries must yield like contributions from sales of lots or plots. West Ridgelawn is not to be developed as a unit, according to Frank's latest decision and announcement. According to his plan it is to be cut up into large tracts and sold to other cemetery associations for community, society or sectarian burial sites, and they are to improve them according to their tastes and convictions. Frank is now in control of West Ridgelawn.

(*b*) Frank claims the six hundred shares, which, according to his notion, remains to East Ridgelawn, to reimburse him in part for eight hundred and fifty shares, he says, he parted

with under duress. He wants the six hundred shares in substitution.. In 1908 he contributed to East Ridgelawn five hundred shares, the proceeds of which were to be applied to make up a deficiency in the dividend fund. He charges that he was coerced into this by threat of receiverships for the cemeteries. I have nothing but Frank's bald assertion, and that does not make out a case of oppression. The dividend fund was depleted, and the cemeteries were in a precarious condition—in financial distress. The situation may or may not have warranted receiverships, but, at all events, Frank came to the rescue. He gave voluntarily, under stress of circumstances, it is true, but not coercively, as he insists, and he is not entitled to be made whole on that score. It may be that Frank can recover in proper proceedings, as for a loan or for money had and received, but that question is not before me. My present function is to determine the title, legal and equitable, to the shares. Personal claims and latent equities are not involved in the consideration.

The other three hundred and fifty shares, for which Frank claims reimbursement, came to East Ridgelawn from Pond. Pond owned a thousand shares. Frank agreed to buy them for $25,000. He paid $7,500 and defaulted on the balance. They compromised and Frank was given three hundred shares for the money he had paid, and Pond and he exchanged releases. Pond then agreed to' return three hundred and fifty shares to East Ridgelawn, upon condition that his remaining three hundred and fifty shares be purchased. Mr. William H. Bonynge bought them, and thereupon Pond made good his promise, and returned the remaining shares into the treasury of East Ridgelawn. Frank had no interest in them whatever. His claim that Pond held them in trust for him and wrongfully detained them, is utterly refuted by Frank's purchase of Pond's holdings for $25,000.

Another, and, to my mind, conclusive answer to Frank's present claim to the eight hundred and fifty shares is the fact that in 1912 he had a settlement with and executed a general release to East Ridgelawn, which included any interest he might then have had in these shares.

Frank next ventures that Bonynge bought the three hundred and fifty shares from Pond for him and holds them in trust. Bonynge paid his own money for the shares; that Frank admits. Bonynge bargained for himself, not for Frank; that Frank tacitly concedes. Furthermore, in the course of the trial, Bonynge offered to sell the shares to Frank for his exact outlay, but the offer was ignored.

(*c*) Of the five hundred shares turned into the treasury of East Ridgelawn by Frank, to replenish the dividend fund, four hundred and seventy-five shares were sold, in parcels, to certain trustees of the cemetery associations. Frank charges that they were acquired fraudulently and for "no or entirely inadequate consideration," and his insistence is that they should be restored to the treasury. The price paid was $20 per share. The shares had no fixed market value and that seems to have been the then prevailing price. However that may be, there has been no rescission; and, assuming the sale to be rescindable, East Ridgelawn is not entitled to the shares unless the purchase price be returned, and there has been no offer to reimburse. Permanent shares will be certified to the holders of the temporary certificates as set out in paragraph *c* of the petition.

(*d*) Is abandoned.

(*e*) Certificates 33 and 37, each for a hundred shares, were issued to William H. Bonynge. Bonynge divided these shares among the members of the law firm of Black, Olcott, Gruber & Bonynge, of which he was one. Frank's contention is that these shares were given by him to Bonynge for his legal services and that of his firm; that he and his firm "were disloyal and unfaithful to his and their duties" to him, and, because of their dereliction and mal-conduct, the issuance to them of the temporary certificates should be ignored and the shares certified to him, Frank. The charge is wanton; there is absolutely nothing of evidence to justify the aspersions. Furthermore, temporary certificate No. 37 for one hundred shares was not given to Bonynge for professional services, but was in fact issued to him for $2,000 cash, paid to Frank to qualify Bonynge as trustee. Permanent shares will be cer-

tified to the holders of the temporary certificates as set forth in paragraph *e* of the petition.

(*f*) Is abandoned.

(*g*) Certificate 102 for one hundred shares issued to William H. Bonynge. This was paid for in part by the note of Mrs. Bonynge for $1,500 and professional services. The same attack is made upon this certificate as in *e*. A further answer is, that Frank has not offered to return to Bonynge the $1,500 actual cash he received for these shares. The shares will be certified to William H. Bonynge.

(*h*) and (*k*) are merely specifications of subdivisions of the three hundred and fifty shares sold by Pond to Bonynge, treated in *b*.

(*i*) and (*j*) are abandoned.

*Mr. Robert Carey* and *Mr. Harry Lane,* for the defendants-appellants.

*Mr. Adam Frank* and *Mr. Robert H. McCarter* (of *McCarter & English*), for the complainant-respondent.

PER CURIAM.

The decree appealed from will be affirmed, for the reasons stated in the opinion filed in the court below by Vice-Chancellor Backes.

*For affirmance*—THE CHIEF-JUSTICE, SWAYZE, TRENCHARD, PARKER, BERGEN, KALISCH, BLACK, KATZENBACH, WHITE, ACKERSON, VAN BUSKIRK—11.

*For reversal*—None.